Commonwealth *v.* Camm, Appellant.

Argued January 22, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*I. Raymond Kremer,* with him *Alexander Brodsky,* for appellant.

*Martin H. Belsky,* Assistant District Attorney, with him *James D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE POMEROY, May 13, 1971:

This is a direct appeal from a judgment of sentence following a jury trial and a conviction of murder in the second degree.

Appellant Camm, age 21, and one John Bytoff were charged with murder, aggravated robbery, burglary and conspiracy in connection with the death by suffocation of George Koffke, aged 94 in July, 1966. The trials of the two accused were severed, and Camm was tried on the murder charge only.

The primary evidence against Camm was a confession which he gave about 15 hours after Koffke had been found dead in Koffke's home.[1] The issues to be

---

[1] The decendent was killed around 3:00 a.m. on July 12, 1966. At 3:15 p.m. the same day Camm was arrested and brought to Homicide Headquarters in Philadelphia. This arrest was the result of information that he had been seen on a roof near decedent's home in the early morning of that day. About two hours after being taken to police headquarters, and after he had received warnings as to his constitutional rights, and been given a polygraph test, Camm gave an oral statement, followed at 6:00 p.m. by a written statement. The gist of the statement was as follows: On July 12, 1966, at about 2:30 a.m., John Bytoff told appellant that he knew a man who had money. They went to Koffke's residence and walked around the back into a shed that led into the kitchen, where Camm broke a window and climbed into the house. Both Camm and Bytoff put masks over their faces and started searching for money. Koffke woke up and was seen by Camm and Bytoff to "do something at the buffet". After Koffke went back upstairs, Bytoff went over to the buffet and searched for money. Koffke

resolved on this appeal all involve the confession in one way or another and are as follows:

1. Should the confession have been suppressed as involuntary?

2. The appellant having taken the stand to deny the voluntariness of the confession, was prejudicial error committed by Commonwealth questioning which went beyond the voluntariness issue, thus causing defendant repeatedly to claim his privilege against self-incrimination?

3. Was the district attorney's comment to the jury that appellant had not testified on the merits a violation of the privilege against self-incrimination, and if so was it prejudicial?

4. Was certain testimony as to the results of a polygraph test, bearing on how the confession was obtained, so prejudicial as to require granting appellant's motion for mistrial?

5. Did the trial court err in its instruction as to a need for unanimity by the jury in accepting the confession as evidence?

We answer these questions in the negative, and affirm the judgment below.

## I.

### Whether Appellant's Confession Was Voluntary

Appellant asserts that he was not orally given his *Miranda* warnings, *Miranda v. Arizona*, 384 U.S. 436 (1966), that the warning he was given by the police officer was inadequate in that appellant was told that anything he said could be used "for or against" him, that he did not effectively waive his constitutional

---

came downstairs again and Bytoff said, "We'll jump him". Bytoff threw the deceased to the floor, wrapped a sheet around his mouth and asked him "where the money was". When the deceased did not reply, Camm searched the upstairs. On returning, he saw blood in Koffke's ear, then both Camm and Bytoff ran out. All that was taken were three packs of Pall Mall cigarettes.

rights, and that his statement was involuntary in that he was emotionally under par at the time it was given.

There were two pre-trial suppression hearings. The first was in June, 1967, following appellant's motion to suppress. After two days of hearings, Judge JAMIESON, the hearing judge, denied the motion. When the case was called for trial, in August, 1967, appellant again moved to suppress, alleging that all statements and physical evidence were the fruits of an illegal arrest. After further hearing, out of the presence of the jury, the motion was denied by Judge DOTY, the trial judge. Notwithstanding these rulings, appellant, as was his right, see *Commonwealth v. Joyner*, 441 Pa. 242, 272 A. 2d 454 (1971), again challenged the voluntariness of his confession at trial, and the issue was submitted to the jury.

The record of the suppression hearing and the trial discloses that Detective Krimmel, testifying for the Commonwealth, stated that he gave appellant his *Miranda* warnings when first engaging him in conversation at the police station, and that appellant orally acknowledged that he knew the meaning of the warnings; that before appellant voluntarily submitted to a polygraph test, he was again orally given his warnings by Officer Kowalczyk; that appellant made an oral statement, at the beginning of which he was again made aware of his *Miranda* warnings and that appellant then read and signed a typewritten transcription of his statement containing the warnings and a waiver thereof.[2]

---

[2] The warning questions and the answers thereto as contained in the written statement were as follows: Q. "Robert, you have a right to remain silent—and do not have to answer anything at all. Do you understand that?" A. "Yes." Q. "Do you understand that anything you say can and will be used against you in court?" A. "Yes." Q. "Do you want to remain silent?" A. "No, sir." Q. "Do you understand that you have a right to talk with a lawyer before we ask you any questions?" A. "Yes." Q. "Do you understand that

The detective further testified that after the polygraph test had been taken, appellant was told by Officer Kowalczyk that "he was in trouble" and should retain a lawyer, and that appellant had replied that he didn't need a lawyer and would tell the detective "all about it".

The elapsed time from appellant's arrest at his home until the taking of his written statement at the police administration building was just over three hours. He was questioned for about an hour and a half of this period before he confessed, and was, so the policemen testified, calm and stable throughout this period, responsive to questions, and without any indication of intoxication.

Appellant himself testified that after he was arrested and taken to the police administration building, Officer Kowalczyk immediately began to interrogate him. Camm said that he told the officer he had spent the previous evening drinking with John Bytoff. Appellant asserted he was told by Kowalczyk to sign a paper, which the officer only later informed him constituted a written agreement to take a polygraph examination. He further testified that after he took the test, the officer told appellant he was lying. At no time, Camm stated, had he been told of his right to counsel or his right to remain silent; the warnings contained in his written statement had not been read to him or by him.

Dr. Kenneth Kool, a psychiatrist who testified on behalf of appellant, testified that "it seemed improbable to me he [Camm] would be able to give that kind of

---

if you cannot afford to hire a lawyer, and you want one, we will not ask you any questions, until a lawyer is appointed for you?" A. "Yes." Q. Do you want either to talk with a lawyer at this time or to have a lawyer with you while we ask you questions?" A. "No." Q. "Are you willing to answer questions of your own free will, without force or fear and without any threats or promises having been made to you?" A. "Yes."

sequential presentation", i.e., such as was contained in the written confession. He felt that the appellant, with his limited emotional resources, his premorbidity and schizoid tendency, had, in effect, been "brainwashed" by the isolation, the questioning, and the polygraph test, and that the interrogation "would have a much more profound effect on him than it would on a so-called normal person." This testimony, by itself, was not sufficient to compel a finding of mental incompetence, and in any event did not have to be accepted. See 1 Henry, Pennsylvania Evidence, §565 at 576-577.

A careful examination of the record fails to demonstrate that the lower court erred at the suppression hearings in not holding as a matter of law that appellant's confession was involuntary, or that the jury erred in not so finding as a matter of fact. The question of appellant's physical or mental coercion was strictly factual, and it was fully within the jury's competence to reject appellant's version.

Appellant argues that the confession was not knowingly or understandingly given because Officer Krimmel, in administering the constitutional warnings, stated that anything Camm might say could be used "for or against him". Detective Krimmel, confronted on cross-examination at trial with an answer he had apparently given at the first suppression hearing using the "for or against" phraseology in a warning he had given appellant, denied having done so. "I haven't said that at any proceeding. My only recollection is that anything he would say would be used against him at the trial." Officer Kowalczyk stated he had not heard Krimmel give the warning in "for or against" terms. The written statement, signed by appellant, used only the word "against".

Since the trial and decision below in the case at bar, we have held that a warning that a statement might be used "for or against" an accused is constitu-

tionally inadequate. *Commonwealth v. Davis,* 440 Pa. 123, 270 A. 2d 199 (1970) ; *Commonwealth v. Singleton,* 439 Pa. 185, 266 A. 2d 753 (1970). In both of these cases there was no dispute that the only warning given the accused had been that whatever he said could be used "for or against you". In the case before us, on the other hand, the record not only does not compel such a factual finding, but the clear weight of the evidence is to the contrary. The record indicates, moreover, that three subsequent warnings given to Camm, including the written one, were in proper form, saying only "could be used against you", and that no incriminating statements were made by appellant until after the subsequent oral warnings. In this situation, we cannot say as a matter of law that the warnings were not adequate or that the confession which followed them was not understandingly made; nor can we say that the jury verdict which involved a factual determination of adequacy and understanding was not fully supportable.

## II.

Whether the Appellant Was Forced To Claim the Privilege Against Self-Incrimination to His Prejudice

As mentioned earlier, the confession of the appellant was crucial to the Commonwealth's case. Its voluntariness thus became the chief issue at trial. The appellant took the stand in his own behalf for the purpose of attacking the confession by showing it to have been coerced.

Before appellant's direct examination commenced, defense counsel stated his intention of calling the defendant on the voluntariness issue only, "without any waiver of his right against self-incrimination". The court stated that ". . . I will rule on matters as they come up. I cannot foresee what cross-examination will suggest. I will rule on it when I hear them." When, immediately thereafter, appellant took the witness

chair, he testified, confirming what his counsel had said, that it was his intention to claim his constitutional privilege against self-incrimination as to the events of the night of the alleged crimes. The assistant district attorney made no commitment as to what his position would be.

As indicated briefly in part I, appellant's direct testimony included a recital of the course of events and the treatment accorded him by the police from the time of his arrest at his home through the signing of his formal statement at headquarters. He testified as to the questioning to which he was subjected and various coercive measures employed by the officers in their attempt to obtain incriminating statements. He described the manner in which the formal statement was prepared, stated he had read the document through, had made certain corrections to it, and had signed his name at the foot of each page.

Then followed an extensive cross-examination of defendant in the course of which defendant objected or claimed his Fifth Amendment privilege a number of times. The claim of privilege was sustained a number of times,[3] and overruled with respect to an approximately equivalent number. Most of the latter rulings were

---

[3] The questions as to which the privilege was upheld related to the following subjects: whether appellant was related to the victim; whether he had been asked at the original interrogation if he knew the victim had been pronounced dead; whether appellant had made a certain correction in his written statement; whether appellant had initialed the written statement; whether appellant had testified that his signature appeared at the foot of each page of the written statement (this ruling later reversed after it was confirmed that appellant had so testified on direct); whether appellant made a descriptive change in his written statement; when appellant had first seen his alleged co-conspirator on the day of the crime; what appellant was wearing when the police arrived at his apartment; and whether appellant had in fact participated in the incident which resulted in decedent's death.

because the matters involved had been referred to in direct examination.

The appellant's argument is not that the court erred in overruling the claim of privilege in the instances where the court did so, but that prejudice resulted to the appellant when he was obliged repeatedly to claim the privilege. Appellant in his brief asserts that "The District Attorney over and over again successfully, in effect, forced the defendant into an open-Court confession of guilt, by forcing him to claim his privilege." Appellant's position is, furthermore, that when he took the stand and gave advance notice of his non-waiver of the Fifth Amendment privilege as to the events surrounding the crime, and the court allowed him to do so, this was tantamount to a ruling that appellant could take the stand without danger of losing his privilege. "It was on this ruling and on this basis that the defendant took the stand", his brief states. The appellant now contends that this understanding was flouted by the assistant district attorney and ignored by the trial court both in its rulings and its subsequent opinion refusing post-trial motions.

The privilege against self-incrimination has been extended by the constitutions of Pennsylvania at least since the Constitution of 1776. The privilege is, of course, a federal right as well, being a part of the Fifth Amendment, and as such has been made applicable to state proceedings through the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1 (1964). Any witness in a judicial proceeding has the right to refuse to answer certain questions on the ground that to do so might tend to incriminate him. A defendant in a criminal proceeding, moreover, may refuse, under the same constitutional protection, to take the witness stand altogether. The issue with which we are here concerned is the status of the privilege of a defendant who does take the stand to testify on his own behalf, but for a

limited purpose; specifically, whether the privilege against self-incrimination was waived for all purposes when Camm testified to the events surrounding his arrest, detention, interrogation and confession.

The court *en banc* below, in its opinion, gave an affirmative answer, thus holding that appellant was given a large indulgence not legally required when the trial court sustained any claims of privilege. There are cases which tend to support this view.[4] We think, however, the more correct reading of these cases is that if a defendant takes the stand and opens an area of inquiry, he cannot claim the privilege when, on cross-examination, he is interrogated in that particular area, and that wide latitude should be allowed in cross-examination.[5]

In the case at bar, since appellant's direct testimony was restricted to the general question of voluntariness of his confession, the waiver of his privilege was co-extensive with the permissible scope of cross-examination relative to that subject; it was not a general waiver. *Brown v. United States,* 356 U.S. 148 (1958); *Calloway v. Wainwright,* 409 F. 2d 59 (5th Cir. 1968). The Commonwealth sought to justify a number of the questions of the district attorney on the theory that truth

---

[4] See, e.g., *Commonwealth v. Albert,* 198 Pa. Superior Ct. 489, 182 A. 2d 77 (1962); *Schwinger Appeal,* 181 Pa. Superior Ct. 532, 124 A. 2d 133 (1956); *Commonwealth v. Downer,* 159 Pa. Superior Ct. 626, 49 A. 2d 516 (1946); *Commonwealth v. Mosier,* 135 Pa. 221 (1890). See, also, *Sawyer v. U. S.,* 202 U.S. 150 (1906); *Brown v. U. S.,* 356 U.S. 148 (1958) ("the breadth of his waiver [of the privilege] is determined by the scope of relevant cross-examination.").

[5] As to the permissible scope of cross-examination of witnesses in criminal trials in Pennsylvania, see *Commonwealth v. Cheatham,* 429 Pa. 198, 239 A. 2d 293 (1968); *Commonwealth v. Lopinson,* 427 Pa. 284, 234 A. 2d 552, vacated on other grounds, *Lopinson v. Penna.,* 392 U.S. 647 (1968); *Commonwealth v. Mickens,* 201 Pa. Superior Ct. 48, 191 A. 2d 719 (1963).

of the contents of the confession was relevant to the question of voluntariness. The trial court properly ruled to the contrary, and sustained the claim of privilege to such questions. *Rogers v. Richmond,* 365 U.S. 534 (1961) ; *Commonwealth v. Senk,* 412 Pa. 184, 194 A. 2d 221 (1963) (vacated on other grounds, *Senk v. Penna.,* 378 U.S. 562) ; *Commonwealth v. Vento,* 410 Pa. 350, 189 A. 2d 161 (1963).

Appellant contends, however, as indicated above, that the prosecution caused prejudice by forcing him to claim his privilege, presumably on the theory that the claim of privilege is construed by a trier of fact to be an admission of guilt. Thus, it is argued, refusing to be a witness against oneself supplies, inferentially, the evidence the defendant seeks to avoid giving. There are cases where the prosecution has called a witness, knowing beforehand he would claim the privilege, and then attempted to supplement the state's case by inferences drawn from the witness' silence. *Fletcher v. U. S.,* 332 F. 2d 724 (D.C. Cir. 1964) ; *U. S. v. Tucker,* 267 F. 2d 212 (3rd Cir. 1959) ; *People v. Pollock,* 21 N.Y. 2d 206, 234 N.E. 2d 223 (1967). See *Namet v. U. S.,* 373 U.S. 179, 186-87 (1963) ; *U. S. v. Maloney,* 262 F. 2d 535 (2d Cir. 1959). Our review of the present record fails to persuade us that any such conscious or flagrant attempt to build a case from improper inferences was made in this case.

A defendant cannot protect himself against wide-ranging cross-examination merely by announcing that he is taking the stand solely to refute the voluntariness of his confession. On the contrary, he subjects himself to good-faith cross-examination and the discretionary rulings of the trial judge as to the permissible scope of that cross-examination. In deciding to take the stand, the defendant must weigh the risks of so doing against the risks of not doing so. Since, in the case before us, there was no advance ruling by the court on the conse-

quences of appellant taking the stand and there was no agreement by the district attorney not to cross-examine, we find no prejudice of which appellant can now complain.

### III.
### Whether the District Attorney Made Adverse Comment Upon Defendant's Refusal To Testify on the Merits of the Charges Against Him

In his closing argument, the district attorney commented: "But, there is the additional issue, of course the ultimate issue, of whether or not he did it and you heard him when he took the stand and you never once heard his attorney ask him whether he was responsible for the killing of George Koffke. And you never once heard his attorney ask him what he was doing on that particular evening."

The appellant asserts that this is reversible error as an improper comment upon the accused's failure to testify.[6] There are two possible bases of support for such an assertion. The first is a Pennsylvania statute, the Act of May 23, 1887, P. L. 158, Section 10, 19 P.S. 631, which provides in part: "[n]or may the neglect or refusal of any defendant, actually upon trial in a criminal court, to offer himself as a witness be treated as creating any presumption against him, or be adversely referred to by court or counsel during trial."

The second basis is the decision of the United States Supreme Court in *Griffin v. California,* 380 U.S. 609 (1965), which held that the Fifth Amendment, by its application to the states through the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instruction by the court that such silence is evidence of guilt.

---

[6] Appellant's attorney objected to this comment, but did not move for a mistrial or for the withdrawal of a juror; the judge then stated, "You cannot comment on this, Mr. Phillips. . . . Just comment on the testimony that was given."

The Act of 1887 has been generally construed to permit a comment by the court or district attorney that the Commonwealth's case is uncontradicted or undenied, but to forbid adverse reference to defendant's failure to take the witness stand or the drawing of an unfavorable inference therefrom. *Commonwealth* v. *Bolish,* 381 Pa. 500, 522, 113 A. 2d 464 (1955); *Commonwealth v. Kloiber,* 378 Pa. 412, 419, 106 A. 2d 820, cert. denied, 348 U.S. 875 (1954); *Commonwealth v. Chickerella,* 251 Pa. 160, 163, 96 Atl. 129 (1915); *Commonwealth v. Smith,* 186 Pa. Superior Ct. 89, 97, 140 A. 2d 347 (1958); *Commonwealth v. Bova,* 180 Pa. Superior Ct. 359, 362, 119 A. 2d 866 (1956).

In a case decided subsequent to the United States Supreme Court's decision in *Griffin v. California, supra,* the Superior Court concluded that the *Griffin* holding "comports with our interpretation of the Pennsylvania Statute." *Commonwealth v. Reichard,* 211 Pa. Superior Ct. 55, 233 A. 2d 603 (1967). That case involved an alibi defense to a charge of robbery, presented by two alibi witnesess on behalf of one defendant and none on behalf of the co-defendant. The district attorney, in his argument to the jury, stated, "I ask you one thing, did you hear one word of denial?" The court found that in light of the record this statement implied that the defendants themselves were the only one who could and should have denied the charges against them, and that the jury might reasonably infer from this statement that their failure to do so was evidence of their guilt. It accordingly held that "the statement was adverse under the Act, as well as violative of the defendants' rights under the Fifth and Fourteenth Amendments of the United States Constitution." 211 Pa. Superior Ct. at 60.

There is no need for us now to determine whether the Act of 1887 as interpreted by our decisions is fully equivalent to the federal anti-comment rule as inter-

preted by *Griffin* and other cases. A criminal defendant is entitled to the maximum protection afforded by either the federal or state standard. In the present case, as we have held, the appellant had made but a partial waiver of his constitutional privilege. The comment of the assistant district attorney certainly invited an adverse inference by the jury from the failure of the appellant to testify as to his innocence.[7] We think the assistant district attorney went too far, both under the Act of 1887 and under the Fifth Amendment proscription as enunciated in *Griffin.*

So to hold, however, does not end consideration of this issue, for a new trial is not required if the error committed by the assistant district attorney was harmless "beyond a reasonable doubt". *Chapman v. California,* 386 U.S. 18 (1967). The United States Supreme Court has recognized this limitation on *Griffin* in *Anderson v. Nelson,* 390 U.S. 523 (1968), and *Fontaine v. California,* 390 U.S. 593 (1968). In the former case the court held that: ". . . comment on a petitioner's failure to testify cannot be labeled harmless error in a case where such a comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for conviction, and where there is evidence that could have supported acquittal." In both *Anderson* and *Fontaine,* the court noted the insufficiencies of the state's case and the likelihood that without the adverse comments the jury would not have returned guilty verdicts.

The case before us stands in sharp contrast to *Anderson* and *Fontaine.* Here the comment was not extensive, no inference of guilt from silence was stressed to the jury, and there was no evidence that could have

---

[7] While the challenged comment in the case at bar was couched in terms of the defendant's lawyer not asking him certain crucial questions, rather than in terms of the defendant's refusal to testify or to deny the charges against him, we think this distinction is immaterial.

supported acquittal. The assistant district attorney's statement was lacking the vindictive qualities of those questioned in *Griffin, Anderson* and *Fontaine,* and must be viewed in light of the fact that here the defendant was in fact a witness, even though for a limited purpose. The only ground on which Camm could have been acquitted was not evidence of his innocence, for there was none, but a finding that the confession was involuntary. The facts stated in the confession, while subject to disbelief by the jury, were not put in issue in any way, and there was damaging circumstantial evidence in the form of a witness' testimony which was corroborative of the confession.

## IV.
### Whether Testimony as to a Polygraph Test Was Ground for a Mistrial

The rule in Pennsylvania is that reference to a lie detector test or the result thereof which raises inferences concerning the guilt or innocence of a defendant is inadmissible. *Commonwealth v. Johnson,* 441 Pa. 237, 272 A. 2d 467 (1971) ; *Commonwealth v. Saunders,* 386 Pa. 149, 125 A. 2d 442 (1956) ; *Commonwealth v. McKinley,* 181 Pa. Superior Ct. 610, 123 A. 2d 735 (1956) ; *Commonwealth ex rel. Riccio v. Dilworth,* 179 Pa. Superior Ct. 64, 115 A. 2d 865 (1955). Appellant contends that this rule was violated at his trial by the testimony of Officer Kowalczyk, a Commonwealth witness. Kowalczyk testified that after he had reviewed the papers he had received from the lie detector test taken by appellant, "I turned to this defendant and told him, I says 'Son, you're in trouble'. I says 'You need an attorney and I advise you not to say a word.' "

Taken by itself, it is certainly a fair inference from this statement that the result of the test was unfavorable. The statement must, however, be put in perspective. Earlier in the trial Detective Krimmel, another witness for the prosecution, had been asked about the

giving of the lie detector test as a part of the total circumstances bearing on the treatment of the accused, his conduct and bearing at the time of his interrogation, and in general the voluntariness issue. The assistant district attorney asked Krimmel what transpired after the completion of the tests, whereupon the court made certain the witness understood he was not asked as to the result of the test. Before Detective Krimmel could answer, defense counsel moved to withdraw a juror on the ground that the test result was already inferentially in evidence. This was overruled, but the court announced clearly to counsel and the witness that a statement of the result would be ground for a mistrial, unless it were to come out on cross-examination. No further questions were asked concerning the polygraph test; at no time on direct examination did the detective give any testimony bearing on the result of the polygraph test.

On cross-examination, Detective Krimmel was asked by defense counsel what occurred between the time Officer Kowalczyk administered the polygraph examination and the time when Camm made his oral confession. His reply was that Officer Kowalczyk told Camm he was lying and needed a lawyer. This was the first time any inference was raised as to the result of the test. Later, when Kowalczyk himself was on the stand, he gave the answer which is quoted above in response to the following question by the assistant district attorney: "Now, without going into the results of the tests, without stating the result, what happened after you administered the tests?" On direct examination of the appellant, the appellant also testified that Kowalczyk told him he was lying. Later still, the polygraph charts and results were offered in evidence by appellant's counsel, and admitted.

A review of the record makes it clear that the giving of the lie detector test was important only as one as-

pect of the total sequence of events bearing on the issue of voluntariness of appellant's confession; the result or veracity of the test was not sought to be elicited by the Commonwealth, and the inference of an unfavorable test result was first brought out by counsel for the appellant on cross-examination of Officer Krimmel. In these circumstances, the subsequent testimony of Officer Kowalczyk, clarifying what he had said to the appellant following the test, was not prejudicial error to which appellant could properly object, and the motion for a mistrial was correctly refused.[8]

## V.

### Whether the Trial Judge Erred in Instructing the Jury as to Accepting the Confession as Evidence

After the Jury had been fully instructed and had initially retired, they returned to the courtroom with several questions. One of them was, "Must all twelve jurors accept the statement as evidence, or is this a majority vote?" The reply of the court was:

"I said that when you render your verdict, it must be unanimous. Now, it is not necessary that for example, if some juror is determined that acquittal should be based on one set of facts, and another that it should be based on another set of facts, you are all unanimous on the verdict, why of course that is the important thing.

"Of course, insofar as the verdict of guilty is concerned, if you are all unanimous on the question of the defendant's guilt, why then you render your verdict just in that respect.

---

[8] If prejudicial error is committed through introduction of an inadmissible test result or an inadmissible implication of the result, it cannot be cured by a cautionary instruction. *Commonwealth v. Johnson*, 441 Pa. 237, 272 A. 2d 467 (1971). We note, however, that the trial judge in the case at bar did instruct the jury to ignore the results of the polygraph test, even though they were introduced by the appellant.

"Now, if you are not unanimous on the guilt or innocence of the defendant, then you just have to deliberate further.

"The question of the statement is just one of the factors in the whole case, and this you must consider along with all of the other factors in the case as you determine what your verdict should be.

'Now, I think that answers your question. When you return your verdict it must be unanimous."

After a sidebar conference with counsel, at which defense counsel objected to the court's answers as inadequate, the judge continued:

"I will just add one thing more, members of the jury. As I have previously explained to you, it is the Commonwealth's burden to prove the defendant's guilt beyond a reasonable doubt, and of course, all twelve of you must agree to that before you can render a verdict of guilty.

"On the other hand, of course, if you do not all agree on that, you continue to deliberate. If you have a reasonable doubt, why then you render your verdict accordingly.

"I think I have explained this at great length to you in my original charge, and I see some of you shaking your heads in assent, which I assume indicates that you recall that."

The appellant insists that the only correct answer to the jury's question was a direct, flat statement that they must unanimously accept the evidence, and that unless the statement was so accepted and considered, there was insufficient evidence upon which to convict.

Certainly the jury had to be unanimous in accepting the confession as voluntary; they also had to accept the confession as evidence to some degree because, as stated several times by Judge Doty in his main charge, "The Commonwealth's case rests or falls upon the statement given by the defendant."

It does not follow, however, that each juror need accept the validity or veracity of the confession to exactly the same extent as every other juror, and that is apparently the thought which the judge was expressing in his answer to the jury's question. In a careful and thorough charge the judge had previously explained to the jury at least twice that they had to find the statement to be voluntary beyond a reasonable doubt before considering it as evidence.[9] The supplemental charge, while perhaps not as specific as it could have been, made it clear that while the jury had to be unanimous in finding the defendant guilty beyond a reasonable doubt, there was no requirement that each juror individually support that finding of guilt on precisely the same evidence or by according exactly the same weight to various pieces of evidence.

When the instructions are read and considered as a whole, *Commonwealth v. Lopinson*, 427 Pa. 284, 234 A. 2d 552 (1967) ; *Commonwealth v. Whiting*, 409 Pa. 492, 187 A. 2d 563 (1963), it is evident that the jury was told that they must find the statement to have been voluntarily made, that thereafter they must individually determine to what extent the statement was true or false (i.e., to what evidentiary weight it was entitled) and that they must unanimously find the defendant guilty in light of the evidence. We think the presentation of these various considerations was fairly and accurately done, and that no prejudicial error was committed.

---

[9] The following excerpt from the charge is illustrative: "As I said, if you find from the evidence that the confession in this case was not made voluntarily but was, in fact, an involuntary statement as the result of threats or promises, or if you have a reasonable doubt concerning the same, you are to disregard that confession entirely. On the other hand, if you conclude that the statement allegedly made by this defendant was made freely and voluntarily, then you may consider whether or not it is truthful and correct, and the weight you give to it is for you to determine."

Finding no error in the lower court proceeding, we affirm the judgment of sentence.

Mr. Justice COHEN took no part in the decision of this case.

———

DISSENTING OPINION BY MR. JUSTICE EAGEN and MR. JUSTICE ROBERTS:

We dissent and would award a new trial. It is our view that the district attorney's comments to the jury, concerning the defendant's failure to deny responsibility for the killing involved and the testimony of the police witnesses concerning the polygraph test, were so prejudicial as to deny Camm a fair trial. In view of the above conclusions, we deem it unnecessary to reach the other asserted assignments of error.